**HILO COAST PROCESSING COMPANY, et al., Plaintiffs,**

**and**

**California and Hawaiian Sugar Company, Third-party plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 443–81C.**

United States Claims Court.

Jan. 8, 1985.

---

Loyd W. McCormick, San Francisco, Cal., for plaintiffs and third-party plaintiff; Stephen A. Zovickian, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., of counsel.

Linda Lance Cromwell, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## OPINION

NETTESHEIM, Judge.

This case was transferred to the court after cross-motions for summary judgment had been briefed. Plaintiffs challenge a determination by the United States Department of Agriculture (the "USDA" or the "Department") denying coverage to part of their 1977 sugar crop under a price support payment program for the 1977 crop of sugar beets and sugar cane administered by the Commodity Credit Corporation and the Agricultural Stabilization and Conservation Service. Plaintiff Hilo Coast Processing Company and 13 other named plaintiffs (collectively referred to as "plaintiffs") together comprise the sugar industry of Hawaii, which accounts for roughly 20 percent

of domestic sugar production. Third-party plaintiff California and Hawaiian Sugar Company ("C & H") is the cooperative refining and marketing association of plaintiffs.

## STANDARD OF REVIEW

■ The parties agree that the standard of review is whether the USDA's action was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 238 (8th Cir. 1975) (citations omitted); *accord Hiatt Grain & Feed, Inc. v. Bergland*, 446 F.Supp. 457, 478 (D.Kan.1978) *aff'd*, 602 F.2d 929 (10th Cir.1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980); *see Arlington Oil Mills v. Knebel*, 543 F.2d 1092, 1095 n. 6, 1099 (5th Cir.1976) (promulgation of USDA price support regulations and reconsideration thereof subject to the rulemaking requirements of 5 U.S.C. § 553). *See generally Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971). The scope of the inquiry permitted under this standard is confined to the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). *De novo* review is not permitted. Instead, section 10(e)(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982), requires a "thorough, probing, in-depth review" of the agency action, *Citizens To Preserve Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823, to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 824; *Independent Meat Packers Ass'n*, 526 F.2d at 238.

■ An agency rule normally would be arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443, 458 (1983). While the court "is not empowered to substitute its judgment for that of the expert agency," *id.,* the agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). The court "may not supply a reasoned basis for the agency's action that the agency itself has not given ... [but it] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). The agency construction need not be "the only reasonable one, or even ... the result a court would have reached." Instead, " 'the judicial function is exhausted when there is found to be a rational basis for the [administrative] conclusions ....' " *Nabisco, Inc. v. United States,* 220 Ct.Cl. 332, 340, 599 F.2d 415, 419 (1979) (quoting *Port Authority of Saint Paul v. United States,* 193 Ct.Cl. 108, 120, 432 F.2d 455, 461 (1970)); *accord Carruth v. United States,* 224 Ct.Cl. 422, 437, 627 F.2d 1068, 1076 (1980). *See generally Hiatt Grain & Feed, Inc.,* 446 F.Supp. at 478–80.

██ The case before the court is somewhat unusual in that the action being challenged is the Department's refusal to amend a regulation that concededly was rational when first promulgated. Thus, this case is analogous to cases involving challenges to an agency's refusal to adopt a proposed rule. An excellent discussion of the difficulties confronting a court deciding such a case appears in *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1043–53 (D.C.Cir.1979). *See also State Farm Mutual v. DOT,* 680 F.2d 206, 218–22 (D.C.Cir.1982), *aff'd sub nom. Motor Vehicle Manufacturers Ass'n v. State Farm Mutual,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (review of rescission of regulation); *WWHT, Inc. v. FCC,* 656 F.2d 807, 814–19 (D.C.Cir.1981) (review of refusal to initiate rulemaking proceedings).

In *National Resources Defense Council,* the court held that the agency's refusal to adopt rules was reviewable under the arbitrary and capricious standard. In reaching that conclusion, the court weighed a number of "pragmatic considerations" bearing on the question whether the agency determination was a "proper subject of judicial review." 606 F.2d at 1043. The same factors also determined the scope of review. *Id.* at 1052. The court identified considerations such as unavailability of data, the wastefulness of requiring an agency to pursue a potentially unprofitable line of investigation, budgetary limitations, and the hypothetical character of judicial review of an agency's refusal to promulgate a rule. *Id.* at 1045–47. Such considerations did not apply in situations in which extensive rulemaking proceedings focused on the rules at issue had taken place already and the agency had explained in detail its refusal to adopt the rules. *Id.*

In the case at bar, such proceedings did occur, and extensive negotiations took place regarding the proposed amendment. Because this case involves a proposal to amend the rule after the issues had been further clarified by developments subsequent to the original promulgation, the agency's decision refusing to amend is, if anything, more amenable to judicial scrutiny than would have been a challenge to the original promulgation of the rule. Moreover, this case involves a claimed entitlement to subsidies, not "[a]n agency's discretionary decision *not* to regulate a given activity," such as is "inevitably based, in large measure, on factors not inherently susceptible to judicial resolution ...." *Id.* at 1046. Finally, plaintiffs' challenge is based on internal inconsistency in the regulations resulting from intervening amendments which have left plaintiffs singled out for special and seemingly unfair treatment. *See id.* at 1045. Thus, "unusual or compelling circumstances" are present calling for judicial review. *See id.,* 1049 n. 23.

## FACTS

The facts derive from the submissions on summary judgment. The parties' views of certain facts differ, but can be resolved based on analysis of the material in the record. No genuine issue of material fact is present with respect to the events critical to this court's determination—what information and arguments were before the agency when the decision was made not to accord plaintiffs the favorable consideration that was given to others.

1. *The original price support payments program*

Responding to a depression in world and domestic sugar prices, President Carter instructed the Secretary of Agriculture (the "Secretary") on May 4, 1977, to institute a payments program to support domestic sugar prices pursuant to his existing authority under section 301 of the Agriculture Act of 1949, 7 U.S.C. § 1447 (1976). A proposed rule governing the program was published on June 14, 1977. 42 Fed.Reg. 30,409 (1977). The final rule was promulgated on October 7, 1977. 42 Fed.Reg. 54,556 (codified at 7 C.F.R. §§ 1435.1–14 (1978)).

The rule provided for payments to processors of cane and beet sugar, which agreed, in turn, 7 C.F.R. § 1435.6, to pay a specified support price to the "producers," *i.e.,* growers, which supply them with cane or beets. The parties agree that the object of the program was to support payments to growers, not processors. Under section 1435.5 the rate of payments to processors was to be the amount by which the "national average market price" received by all processors for that quantity of 1977-crop sugar "marketed" during the "marketing period" fell short of 13.5¢ per pound—an amount considered adequate to enable a processor to make support payments to its growers at the specified rates.

The "quantity of sugar marketed" by each processor which was to be eligible for price support payments was defined at 7 C.F.R. § 1435.3(d) as

the pounds of refined beet sugar or cane sugar, raw value, *marketed from the 1977 crop during the marketing period* as provided herein. Refined beet sugar or *raw cane sugar shall be deemed to have been marketed when* delivered to the purchaser or to a carrier for delivery to the purchaser or when title otherwise passes to the purchaser or when sugar has been *contracted and committed for future delivery, but only to the extent that gross proceeds are accounted to the seller;* ...

(Emphasis added.)

The processing of beets into refined white table sugar is a one-step process. In contrast, the processing of sugar cane results in raw cane sugar, which is similar to brown sugar and typically sold to refiners which further refine it into table sugar.[1]

The Hawaiian sugar industry is organized along different lines than the rest of the United States sugar industry. First, most of the Hawaiian sugar cane growers also process their cane into raw sugar. Those which do not do so contract out the processing of their cane while retaining ownership over it. Plaintiff Hilo Coast Processing Company processes, but does not produce, sugar cane. The second distinctive feature of the Hawaiian industry is that plaintiffs do not sell their raw sugar to a separate refiner. Instead, their raw sugar is both refined and marketed by a non-

---

**1.** The product of beet processors thus is more valuable than that of sugar cane processors. Therefore, before sales by beet processors could be included with raw sugar sales in the computation of a national average market price for the processors' product, it was necessary to convert the proceeds received for refined beet sugar to a "raw sugar price equivalent basis." To achieve this, beet sugar proceeds were reduced by the percentage by which the average market price received for refined beet sugar exceeded the average price received for raw cane sugar. 7 C.F.R. § 1435.8. A rate was also established for converting the quantity of beet sugar sold to an equivalent quantity of raw sugar. Including the proceeds of plaintiffs' sales of sugar in the computation of the national average market price posed a different problem. *See infra* note 2.

profit entity which is cooperatively owned by plaintiffs—third-party plaintiff C & H.[2]

The definition of "quantity of sugar marketed" contained a proviso, which gave rise to the instant suit—

[t]hat where raw cane sugar processors market their sugar through a cooperatively-owned refiner, marketing shall not be deemed to have occurred until a sale of refined sugar is made by the cooperative.

This proviso, applicable to plaintiffs, was included on the advice of third-party plaintiff C & H, acting as spokesman for all the plaintiffs, in a July 6, 1977 letter to USDA's Sugar Task Force.

C & H's letter pointed out "that the delivery of raw sugar by a Hawaiian processor to C & H does not constitute a marketing in that no price is determined or determinable as a result of such a delivery." C & H therefore suggested that "marketing" be deemed to occur only upon a sale by the cooperative, because "[o]nly then is there a transaction having any significance on the sugar market or which permits of a determination of a market price realized from a sale."

As a result of later developments, the proviso created disadvantages for plaintiffs, relief from which is the goal of their suit in this court. Specifically, plaintiffs wish to accelerate the date on which their sugar is deemed marketed to the time of transfer from plaintiffs to C & H in order to bring more of their sugar within the unexpectedly early cut-off date for the "marketing period." Defendant would hold plaintiffs to the unforeseen consequences of their original position.

**2.** This unique arrangement called for a different treatment (one not at issue here) of plaintiffs in calculating the "proceeds" derived from their raw sugar for purposes of calculating average market prices for raw sugar. Eight percent was deducted from C & H's final sales of refined sugar to reflect the processors' (plaintiffs') investment in their cooperatively-owned refineries, 7 C.F.R. § 1435.7 (one of which, at Crockett, California, is the largest in the world).

A similar problem arose in the case of entities known as "integrated processor-refiners" (the

### 2. *Birth of the loan program and amendment of the payment program*

Under the original rule promulgated on October 7, 1977, the term "marketing period," as used in 7 C.F.R. § 1435.3(d), was defined as "the period September 15, 1977, forward until all 1977 crop sugar has been marketed." 7 C.F.R. § 1435.3(e). Only sugar "marketed" during this period was eligible for support payments. The period was cut short by the substitution of a new program, the "loan program," for the original payment program.

The "loan" or "purchase" program was mandated by the so-called de la Garza amendment to the Food and Agriculture Act of 1977, Pub.L. No. 95–113, § 902, 91 Stat. 949 (1977) (codified at 7 U.S.C. § 1446(f) (Supp. IV 1980)), enacted by Congress on September 29, 1977. Section 902 provides:

Effective only with respect to the 1977 and 1978 crops of sugar beets and sugar cane, section 201 of the Agricultural Act of 1949, as amended, is amended by—

(1) striking out in the first sentence "honey, and milk" and inserting in lieu thereof the following: "honey, milk, sugar beets, and sugar cane"; and

(2) adding at the end thereof a new subsection (f) as follows:

"(f)(1) The price of the 1977 and 1978 crops of sugar beets and sugar cane, respectively, shall be supported through loans or purchases with respect to the processed products thereof at a level not in excess of 65 per centum nor less than 52.5 per centum of the parity price therefor: *Provided,* That the support level may in no event be less than 13.5 cents

"IPRs") which, although purchasing most of their sugar cane from independent producers, do not sell raw sugar to refiners, but both process and refine it themselves. As with the Hawaiian industry, no sale of the IPRs' raw sugar occurs. Unlike refined beet sugar and Hawaiian sugar, however, the IPRs' sugar was simply excluded from the computation of the national average market price for raw sugar, 7 C.F.R. § 1435.8(a), probably because the IPRs account for only three percent of domestic production.

per pound raw sugar equivalent. In carrying out the price support program authorized by this subsection, the Secretary shall establish minimum wage rates for agricultural employees engaged in the production of sugar.

"(2) Notwithstanding any other provision of law, the Secretary may suspend the operation of the price support program authorized by this subsection whenever the Secretary determines that an international sugar agreement is in effect which assures the maintenance in the United States of a price for sugar not less than 13.5 cents per pound raw sugar equivalent.

"*(3) Nothing in this subsection shall affect the authority of the Secretary to establish under any other provision of law a price support program for that portion of the 1977 crop of sugar cane and sugar beets marketed prior to the implementation of the program authorized by this subsection.*".

(Emphasis added.) The Report of the House and Senate Conferees on the bill as finally enacted explains the purpose of subsection 902(3) as follows:

The language in the provision relating to the Secretary's existing authority to establish a price support program for sugar was added by the *Conferees* for purposes of clarifying the status of 1977 crop sugar beets and sugar cane marketed before the program authorized by the *House* amendment can be made effective. This provision does not add to or detract from whatever authority the Secretary already has under existing law. The language was included because sugar from beets and cane would not be available for loans or purchases, and producers in some States would be discriminated against solely because they happened to be farming in areas with crop years somewhat different from producers in other areas. It was not intended by the amendment to create a hardship in any producing area. Consistent with existing law, *the added language thus makes clear the Conferees' intent that fair and equal treatment be afforded all domestic producers by extending price support to that portion of the 1977 crop marketed before the new program can be made effective, it being a purpose of this section that a substantially equal level of price support be provided for all sugar cane and sugar beets of the 1977 crop.*

H.Conf.Rep. No. 599, 95th Cong., 1st Sess. 174, *reprinted in* 1977 U.S.Code Cong. & Ad.News, 2445, 2474 (emphasis added). The conferees also recommended that the new program be implemented as soon as possible "—even before the Act is signed into law." *Id.*

On November 7, 1977, the Commodity Credit Corporation (the "CCC") published amendments to the payment program. 42 Fed.Reg. 57,948 (1977). *Inter alia,* the amendments redefined "marketing period" as

the period commencing when 1977-crop sugar was first marketed and ending when all 1977-crop sugar has been marketed or when the program provided for in this subpart is superseded by another price support program for 1977-crop sugar, whichever occurs first.

The informal rulemaking procedures of 5 U.S.C. § 553 were dispensed with as "impracticable and contrary to the public interest." Since the payments program was already in operation, it was essential to implement the amendments at once. 42 Fed.Reg. 57,949.

On the following day, November 8, 1977, the Secretary announced the implementation of the loan program, and on December 28, 1977, "marketing period" was redefined as "the period commencing when 1977 crop sugar was first marketed and ending on November 7, 1977." 42 Fed.Reg. 64,677, 64,678. Roughly 190,000 pounds or 18.5 percent of C & H's sugar neither had been marketed nor committed for future delivery by November 8, 1977.

3. *The "gap" in program coverage and the attempt to close it*

Regulations implementing the loan program were promulgated on November 11,

1977. 42 Fed.Reg. 58,734 (1977) (codified at 7 C.F.R. § 1435.15–25 (1978)). Under this program processors were eligible for non-recourse loans at the rate of 13.5¢ per pound of raw sugar placed in storage as security for the loan. After eleven months, if the market price of sugar did not rise above 13.5¢, a processor could default on the loan. In effect, the Government would have bought the sugar for 13.5¢ per pound. If the market price rose above 13.5¢ per pound before the loan came due, the processor could redeem the sugar and sell it at the higher price. Noting the fact that the 1977 harvest already was in progress, the CCC determined that compliance with the rulemaking procedures of 5 U.S.C. § 553 was "impracticable and contrary to the public interest." 42 Fed.Reg. 58,734.

The announcement of the loan program already had drawn critical comment, however. On November 10, 1977, Senator Russell B. Long wrote to Secretary of Agriculture Bob Bergland complaining that, because of the USDA's non-compliance with the procedures required by the Administrative Procedure Act, sugar processors had been taken by surprise in being "suddenly deprived of the guarantees under which they were operating as late as two days ago." Senator Long's letter asserted that many sugar processors which had committed their sugar for future delivery could not avail themselves of the loan program. Quoting the Conferees' Report on the de la Garza amendment, he argued that "[a]lthough we ... have been urging early implementation of the de la Garza amendment, it certainly was not the Congressional intent, nor ours, that there be a gap between the end of the interim payment program and the increase in market price to 13.5 cents." The Senator apparently was referring to an expected price increase due to import restrictions. *See* Letter of Secretary Bergland to Senator Long dated Nov. 30, 1977. Secretary Bergland's letter replied that consultations with industry representatives had revealed instances in which sugar had been contracted for future delivery before November 8, but priced

based on future market price fluctuations. (As amended on November 7, the regulations required the price of sugar contracted for future delivery to be fixed before November 8 in order for the sugar to be deemed "marketed" by then. *See infra* note 3.) An amendment was under consideration which would deem such sugar marketed before November 8.

An internal departmental memorandum dated November 28, 1977, from Ray Fitzgerald, Administrator of the Agricultural Stabilization and Conservation Service (the "ASCS"), to the Assistant Secretary for International Affairs and Commodity Programs discussed the same problem and recommended that USDA "[a]mend the interim payments program (subsidy) to redefine the 'quantity of sugar marketed' so as to 'cover in' those processors who cannot now take advantage of either program." Another option—delaying the effective date of the loan program to about January 1, 1978, or until tariff increases achieved the support price—was rejected because

[a] majority of domestic processors are in a position to take advantage of the loan program until the market price reaches the support price.... In addition, the fee and tariff increases are, in the minds of the public (but not legally), linked together with the de la Garza program. But, the determination of minimum wages for sugar workers is linked (legally) with the loan program. Finally, choice of this option would likely result in public criticism of the Department for indecisiveness and vacillation.

Accordingly, on December 28, 1977, the definition of "quantity of sugar marketed" was amended by adding the proviso ("the second proviso")

[t]hat a quantity of sugar which does not meet the requirements of the foregoing provisions of this paragraph shall be considered as being marketed during the marketing period if such quantity of sugar has been committed by the procesor [sic] under a contractual agreement entered into prior to the end of the marketing period which (1) requires delivery to

the purchaser on a scheduled basis or at the option of the purchaser and (2) *specifies the method of determining the price of such sugar.*

42 Fed.Reg. 64,678 (1977) (emphasis added).

This amendment presented the danger that the price received for such second proviso sugar would distort the "national average market price" of sugar priced during the original marketing period which ended on November 7, 1977. Later sellers (of second proviso sugar) would receive a higher price for their sugar because of the import restrictions, thereby increasing the average price and correspondingly reducing the subsidy to earlier sellers. At the same time, the later sellers would benefit unfairly from the low average proceeds of earlier sales, which would reduce the average price and correspondingly increase the subsidy to the later sellers.[3] Accordingly, the rest of the December 28 amendments provided for the computation each month subsequent to the original period of an "average market price" for that second proviso sugar the proceeds for which had been reported as accounted to the seller during that month. 7 C.F.R. §§ 1435.3(m), 1435.5(c)(2), 1435.6(f). Ultimately, there were 12 marketing periods, the period November 7 to December 31, 1977, constituting a second period. Affidavit of James E. Agnew, Director, ASCS Commodity Operations Division, Dec. 22, 1982, ¶ 26.

In its explanation of the action taken, the USDA quoted the Conference Report on the purpose of 7 U.S.C. § 1446(f)(3) and stated that it was amending the regulations "[i]n order to assure that price support will be provided for *all* 1977 crop sugarbeets and sugarcane *under either the payment or loan program....*" and "[i]n order to provide a *substantially equal level* of price support for *all* sugarbeets and sugarcane of the 1977 crop...." 42 Fed.Reg. 64,677 (1977) (emphasis added).

### 4. *The integrated processor-refiners and the "gap"*

It quickly came to the attention of USDA that the sugar processors which these amendments were designed to aid were not the only ones which special circumstances had placed in a "gap" between the loan and payment programs. Plaintiffs in this case and the integrated processor-refiners (the "IPRs") found themselves in a different predicament. The IPRs, located in Louisiana, account for roughly three percent of domestic production and both process and refine sugar after purchasing it from independent producers. The IPRs', and most of the Hawaiians', raw sugar is not sold to refiners, but is transferred to their own refining divisions. *See supra* note 2. Because most of the Hawaiian sugar was not "marketed" under the regulations until it

3. In an October 14, 1977 letter to Robert R. Stansberry, Jr., ASCS Director, Procurement and Sales Division, commenting on the payment program regulations, C & H, an early seller as to most of its crop, expressed concern about this very problem. (C & H wrote that it did not understand the meaning of the qualifying language in section 1435.3(d) that sugar under contract for future delivery would be considered as marketed "only to the extent that gross proceeds are accounted to the seller," which might have alleviated its concern about later sellers.)

As a solution C & H's October 14 letter suggested computing on a quarterly basis "as was contemplated by the proposed regulations issued June 14" the average price eventually realized for sugar "contracted and committed for future delivery" under section 1435.3(d). Payments would be made on a given quantity of sugar based on the rate established for the quarter during which that sugar was marketed and contributed to the computation of the average

price. (C & H renewed this suggestion on November 29, *see infra* note 8, by which time C & H apparently feared that the payment program would continue into February 1978). C & H also urged that calculations of sugar marketed, and national average prices received therefor, should be limited to the sugar sold before the loan program then under consideration superseded the payment program (which would have the effect of increasing the market price).

In addition to adopting this suggestion, the USDA's November 7, 1977 amendments also responded to C & H's concerns by redefining "quantity of sugar marketed" to provide that sugar committed for future delivery be deemed to have been marketed during the marketing period only if so committed "within a period not to exceed 30 days following the end of the marketing period, under a written contract fixing both the quantity and price of sugar to be delivered ...." 42 Fed.Reg. 57,949 (1977).

had undergone the later refining stage, less Hawaiian sugar had been "marketed" by November 8 than simultaneously processed sugar belonging to processors which sold their product to refiners.[4] Much unrefined and unsold sugar belonging to the IPRs faced disqualification from the payment program for similar reasons.

In December 1977 a representative of the American Sugar Cane League and officials of two IPRs seeking to avoid this disqualification discussed the treatment of the IPRs under the December 28, 1977 amendment in telephone conversations with James E. Agnew, Acting Deputy Director and later Deputy Director of the Procurement and Sales Division of the ASCS. Agnew Dep. at 142. Mr. Agnew was the USDA official "responsible for directing the activities of the Sugar Branch and formulating program policies and procedures." Id. at 15. The American Sugar Cane League representative explained to Mr. Agnew that, although the IPRs sell refined and not raw sugar, refined sugar sales do not form the basis for settlements with growers. Id. at 144. The IPRs do not have future delivery contracts for raw sugar. Instead, the problem was that, as a practical matter, commitment of the IPRs' raw sugar to their refineries placed them in

the same position as companies which had such contracts (and thus could use neither the loan nor the payment program). Id. (referring to 45 Fed.Reg. 48,866 (1980)). Mr. Agnew testified, "[A]t some point, .. I gave them an administrative decision that their sugar would be considered as marketed when it was committed to the refinery." Agnew Dep. at 145. Specifically, the sugar was to be considered marketed after it was processed and "in effect" transferred to the refinery. Id. at 151. Mr. Agnew explained, "At that time, we believed that that was the only reasonable solution to the problem." Id. at 146.[5]

The USDA's Office of the General Counsel (the "OGC") later reviewed this determination. Following a fact-finding visit on July 5, 1979, to South Coast Corporation (one of the IPRs), James Walczak, a USDA attorney, explained in a July 25, 1979 memorandum to the file why the IPR was unable to avail itself of the loan program in the alternative:

As a matter of efficiency and cost-effectiveness ... the refinery must be operated year round.

In this sense, 100% of South Coast's raw sugar production is completely committed to meeting the requirements of

4. C & H had already expressed concern in its October 14, 1977 letter to the ASCS that, assuming the payment program were superseded on January 1, 1978, C & H would have marketed only about 75 percent of its sugar, yet apparently would be required to pay producers at the support rate as to all 1977 crop sugar. Accordingly, "some changes as to the required level of payments to growers would seem to be required."

5. A joint statement by two IPRs submitted to the USDA's Office of General Counsel on January 15, 1979, explained that the processing of raw sugar was treated for accounting purposes as an internal sale by the processing division to the refining division at fair market value when the sugar was processed. Pursuant to Mr. Agnew's administrative decision, the sugar was deemed "marketed" at the point when it was so accounted to the refining division, i.e., not at the time of physical transfer. See Legal Opinion of Assistant General Counsel John A. Harris dated July 26, 1979; Letter of John R. Cope to Thomas V. Conway, USDA Office of the General Counsel dated Jan. 15, 1979. According to the two IPRs, the prices paid by them to the independent

sugar cane growers were determined by reference to the average market or "spot" prices for raw sugar sales as quoted on the Louisiana Sugar Exchange during the processing seasons. Other Louisiana processors which were not IPRs settled with growers in an identical manner. The two IPRs argued that they should be treated differently from C & H because, unlike the prices received by the Hawaiian growers, the prices paid to the IPRs' growers were totally unrelated to the price of the refined sugar finally sold by the IPRs and were determined independently of whether the IPRs' refining divisions operated at a profit or a loss.

In fact, a large proportion of the IPRs' sugar is grown by the IPRs themselves (40–45 percent, in the case of South Coast Corporation, according to a letter dated August 13, 1979, to James Walczak from an ASCS official stationed in Louisiana). In determining the eligibility of the IPRs' sugar for program support, the USDA did not distinguish between sugar grown by the IPRs and that grown by independent producers. Agnew Dep. at 139.

the refinery. It cannot be diverted from the refinery into [storage under the] loan program without severely disrupting [sic] South Coast's entire operation. Since as a matter of economic practicality the refinery must continue to operate, South Coast would be required to import additional amounts of raw sugar if it wished to place raw sugar under loan. This, of course, would be contrary to the objectives of the loan program....[6]

A July 26, 1979 opinion by Assistant General Counsel John A. Harris on the legality of the treatment of the IPRs argued that although treating the IPRs like C & H "also would have been a reasonable interpretation ... we do not believe that this interpretation is so compelling or clear-cut that it excludes the ASCS interpretation from being reasonable." According to Mr. Harris, there were "significant differences" between the two "which might lead a reasonable person" to treat them differently, "[t]he most important of these differences" being that the IPRs' growers are paid based on raw sugar prices, while C & H's are paid based on refined sugar prices.[7] Mr. Harris wrote, "The purpose of [the second proviso] was to cover a 'gap' in price support coverage into which Louisiana processors (including IPR's) had fallen." Therefore, "[i]t is clear that it was the intent of the officials administering the payment program that all Louisiana processors, including IPR's, were to be cover-

ed by [the second proviso]." To "withdraw price support from a portion of the 1977 crop ... would be contrary to the de la Garza amendment," so Mr. Harris concluded that, if the agency interpretation was inconsistent with the regulations, then the law mandated changing the regulations to comport with it.

USDA's internal auditors disagreed that the regulations as drafted would allow the agency's interpretation. See 45 Fed.Reg. 48,866 (1980). Accordingly, the regulations were amended on July 22, 1980, to comport with Mr. Agnew's December 1977 determination. 45 Fed.Reg. 48,865 (1980). A third proviso was added to section 1435.3(d) that

in the case of sugarcane processors (*other than cooperatives*) who also refine their raw sugar production into refined sugar, the quantity of cane sugar, raw value, processed from the 1977 crop and which is committed to the refining facility of such processor shall be considered as being marketed during the marketing period.

(Emphasis added.)

The Department explained, 45 Fed.Reg. 48,866 (1980), that only their refining operations distinguish the IPRs from other Louisiana processors; that although the IPRs do not have future delivery contracts for raw sugar, "as a practical matter [their] raw sugar is committed to [their] refining facility;" and that, therefore,

---

**6.** The processing division of this IPR supplied only 55 percent of the refinery's raw sugar. The rest of the refinery's requirements were met by purchases from other processors and by foreign imports, according to the ASCS letter dated August 13, 1979.

Importing additional sugar would be contrary to the objectives of the program, presumably because the loan and payments programs were regarded merely as interim solutions to the problem caused by a world sugar glut. Tariffs were intended to provide the longer-term solution. Letter of Secretary Bergland to Senator Dole dated Nov. 2, 1977.

**7.** Mr. Harris' opinion also discussed the eligibility for payments under the second proviso of section 1435.3(d) of quantities of sugar accounted to the refinery after November 7, 1977. (Quoting the IPRs' applications for payments on

this sugar, Mr. Harris actually wrote "accounted to the processor." The sugar under discussion had been processed already. Therefore, it is apparent that he was referring to the point when the sugar had been processed and was treated for accounting purposes as having been sold to the refining division.) At the direction of program officials, this sugar, like sugar accounted to the refinery before November 7, had been reported as marketed before November 7. Mr. Harris reasoned that a "strict reading" of the second proviso, which speaks of a "contractual agreement," would disqualify the IPRs. He concluded, however, that the commitment of the IPRs' raw sugar to their refineries as a practical matter was similar to the contractual commitments of other Louisiana processors which "[t]raditionally" commit their entire product to refineries "well in advance of ... the crop year."

"[f]rom the standpoint of availability of committed sugar for price support loans," the IPRs were situated similarly to processors which were contractually committed to future raw sugar deliveries. The USDA believed the IPRs' sugar "should be eligible to be claimed for payment in the same manner as the sugar is priced for purposes of settlement with growers." Had USDA foreseen the IPRs' predicament, the explanation continues, the regulations would have been drafted to allow the IPRs full participation in the program. *Id.* Given that "the original regulations did not accurately reflect conditions in the sugar industry," that the IPRs relied on the ASCS interpretation, and that the opportunity for alternative participation in the loan program had passed, the regulations should be amended retroactively. *Id.* Because the new rule merely conformed the regulations with "an administrative action previously taken by [USDA] to insure the availability of price support for all of the 1977 crop production of domestically grown sugarcane," 45 Fed.Reg. 48,865, the Department found compliance with the informal rulemaking procedures of 5 U.S.C. § 553 "impracticable and contrary to the public interest," and published the rule without providing an opportunity for public comment. *Id.*

### 5. *Plaintiffs are denied relief*

A strident letter followed on August 12, 1980, from C & H, which had just learned for the first time of the IPRs' treatment, Affidavit of Donald P. Falconer, Senior Vice President, Secretary, and General Counsel, C & H, Dec. 20, 1982, ¶ 6, protesting that the first proviso to section 1435.-3(d) arbitrarily discriminated against the Hawaiian sugar processors which similarly were handicapped from participating in the loan program. But for that proviso, plaintiffs would have been permitted under the other two provisos to accelerate the "marketing" date of their 1977 crop sugar in the same manner as the IPRs and the processors with contracts for future delivery.

C & H took the position in its letter that all Hawaiian 1977 crop sugar was eligible for payments under the second proviso because all of it was contractually committed prior to November 8, 1977, for delivery to C & H under C & H's Standard Sugar Marketing Contract. While it was true that the final price paid Hawaiian processors was not fixed at time of delivery, but depended on the resale price of refined sugar, C & H pointed out that the same was true of Puerto Rican raw sugar, whose price was established (based on current raw sugar prices) when the sugar had been resold by refineries. C & H further argued that the USDA's explanation for its treatment of the IPRs—that their sugar was committed to their refining divisions and therefore ineligible to be placed under the loan program—

appl[ies] with equal force to the situation facing Hawaiian processors. "As a practical matter", none of Hawaii's 1977 crop sugar which was on hand on November 8, 1977 had any access to the Loan Program .... It had either been refined or was irrevocably committed to refining. Sales and shipping contracts [from Hawaii to the California refinery], as well as labor contracts, had been made ....

C & H's letter stated that it had presented this position to USDA on several prior occasions.[8]

---

8. C & H was referring to relatively recent discussions. However, as early as November 29, 1977, a letter from C & H commented that the long default period under the loan program effectively prevented the Hawaiians from placing more than a small fraction of their sugar under loan in any given year because of limited storage space. The letter urged a reduction of the period from eleven to three months. In addition, C & H expressed concern that apparently it would have to pay its growers the support rate on the entire sugar crop of any year in which it participated in the loan program, while only receiving the loan rate on the small portion of the crop that it would place under loan.

Although the regulations allowed refined sugar to be placed under loan, the loan rate on refined sugar did not cover beet processors' costs and therefore would cause sugar prices to remain low. C & H's letter omitted mention of the fact that the 1977 loan rate did not take into account C & H's costs of refining either, as admitted by Mr. Agnew. Agnew Dep. at 205.

Other meetings followed between C & H and USDA officials and with Hawaiian Congressmen and Secretary Bergland, as mentioned in the Secretary's letter dated December 15, 1980. No documentation of any of these discussions appears in the record. In deposition, however, USDA Sugar Branch Chief Laurence E. Ackland, when asked whether he investigated the consequences to C & H's refinery operation if it had placed 1977 raw sugar under loan responded,

I did not. I recall some discussion on the use of the refinery, the cost effectiveness, but I don't remember how much of this came from C & H and how much was internal discussion within the Department.

\* \* \* \* \* \*

As best I can recall, it was discussed because that point had been made either verbally or in writing to C & H. And it was discussed in connection with whether C & H did have raw sugar, or sugar available to be placed under loan. It was considered. As to what precisely what part it played, I don't know, I don't recall.

\* \* \* \* \* \*

... I believe it was discussed within the Branch .... It was discussed at higher levels, too.... I can't remember any particular discussions.

Ackland Dep. at 72–73. Asked what conclusion the USDA reached as to the quantity of raw sugar available to C & H after November 8, 1977, and the quantity needed to keep the refinery operating, Mr. Ackland replied,

I don't recall that. I recall we asked for some information from C & H, and I recall that the situation was studied and that there was raw sugar available for loan after November 8, 1977.

Q. When you say available, do you mean that it was available on [sic] C & H at the expense of shutting down its refinery operations?

A. I don't know that, I know that it was raw sugar and it was available.

Q. In what sense was it available?

A. It was physically there.

*Id.* at 71.

Plaintiffs proffer the affidavit of C & H's Senior Vice President of Operations, Donald W. Hare, who avers that Hawaiian raw sugar production is slack in the winter months, requiring C & H to stockpile raw sugar before winter in order to maintain refinery operations year-round; that by November 8, 1977, the remainder of the 1977 crop was committed to keeping the refinery in operation; and that if the 190,000 tons of sugar had been placed under loan, the refinery would have had to shut down from December 31, 1977, to February 21, 1978. The expected duration of such a shutdown was based on C & H's raw sugar inventories and expected receipts as of November 8, 1977, the average rate of refining at that time, and raw sugar production in early 1978.[9]

---

The letter does refer to the possibility, apparently then under consideration, that the payment program would be amended to cover sugar deliveries through February 1978 (in which event C & H would have had very little need to utilize the loan program, anyway).

C & H also recommended that it be treated as plaintiffs' agent for purposes of taking out loans, because plaintiffs were bound contractually to transfer their sugar to C & H for marketing, and the decision whether to place sugar under loan was essentially a marketing decision.

**9.** The affidavit of Rudolph Ceragioli, Director of Marketing Planning for C & H, also avers that, if the 190,000 tons had been placed under loan, C & H would have been unable, based on inventory levels in late 1977, to meet some pre-November 8 formal contractual commitments for refined sugar deliveries during the winter and also would have lost some sales which were contracted after November 7. The long-term consequences for C & H's market position of breaking contracts and sending customers away would have been grievous. The calculations as to the amount of pre-November 8 commitments that could not have been met are based on the assumption that C & H would have made deliveries on sales contracted after November 8, as they fell due, rather than husband all its sugar to meet the pre-November 8 commitments. Thus, Mr. Ceragioli's calculations, which do not appear in the administrative record, would only support the proposition that, after November 8, C & H would have had to turn down new

Defendant charges plaintiffs with attempting to introduce evidence that was not in the administrative record before the Secretary. Plaintiffs retort that USDA officials "perfectly understood" the basis of plaintiffs' claim, Plfs' Reply filed Feb. 9, 1983, at 11 (citing Ackland Dep. at 70–73); that at the above-mentioned meetings plaintiffs' representatives furnished all information that USDA officials requested; and that Mr. Ackland's testimony shows that USDA officials' interest in C & H's commitment of its sugar to the refineries "stopped with their determination that plaintiffs had an 'opportunity' to place sugar under loan because 'they did in fact physically have the raw sugar [and] to that extent it was available to be placed under loan.'" Plfs' Reply filed Feb. 9, 1983, at 10–11 (quoting Ackland Dep. at 82).

The Secretary did at least have much of the data on which the calculations in the Hare affidavit are based. The Secretary had data for the volume of all sugar sold before and after the cut-off date under pre-November 8, 1977 contractual commitments, because USDA made payments on these quantities. The record also contains an October 1, 1980 letter from E.A. Jaenke, a consultant, to Robert R. Stansberry, Jr., ASCS Director, Procurement and Sales Division, purporting to "respond to the questions you raised by phone on Monday, September 29." This letter sets forth, *inter alia,* the quantities of uncovered sugar on which C & H claims payments, by marketing period in which sold, as well as the details of C & H's inventory positions in raw and refined sugar as of November 8, 1977, and the quantity of 1977 crop sugar still to be delivered to C & H as of that date, all of which was delivered by December 31.

The letter also appears to answer an objection, which defendant makes in the instant suit, that C & H, unlike the IPRs, regularly sells some of its sugar in raw form. Mr. Jaenke supplied figures on quantities of 1977 sugar sold raw by C & H

and stressed that all such sales were made before November 8. The Hare affidavit emphasizes the necessity of selling off any surplus raw sugar production beyond C & H's refining capacity early in the year because of storage and shipping constraints. Hare Aff., Dec. 17, 1982, ¶ 2(c). Mr. Jaenke's letter supports the inference that C & H's practice of selling surplus raws early in the year was among the matters of which USDA became apprised in the course of its negotiations with C & H. *See Camp v. Pitts,* 411 U.S. at 142–43, 93 S.Ct. at 1244; *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1159–60 (9th Cir.1980); *Hiatt Grain & Feed, Inc.,* 446 F.Supp. at 467.

What is more important, the record does not reflect that USDA gave the same consideration to the problem of disrupting C & H's refining operations through the winter that it gave in the case of the IPRs. Like C & H, the IPRs must have had sugar physically available to them to place under loan, or their refineries would have shut down. Had the IPRs placed their 1977-crop raw sugar under the loan program, the consequence, according to Mr. Agnew, was that "[t]hey would have not had the raw material they needed to refine sugar." Agnew Dep. at 154. Asked "What constitutes the fact of the [IPRs'] commitment [of raw sugar to their refineries]?" he replied, "Well, I don't think a company would be in the business of refining—of processing raw sugar and refining it unless they intended to supply the refinery with their own raw sugar production." *Id.* at 147–48. Mr. Agnew agreed with the statements that "C & H makes the business decision that Hawaiian raw sugar will be refined, just as the IPR makes the decision that raw sugar produced by it will be refined, ..." *id.* at 158; that "the business operation of C & H depends on the delivery of raw sugar to it for refining," *id.* at 159; and that "[t]he IPR also had the option of selling raw sugar if it wished, ..." *id.* at 160; and earlier stated that "I don't know that anything actually prevented [the

contracts and send potential customers away—a universal consequence of using the loan pro-

gram. The court does not consider the Ceragioli affidavit within the scope of its review.

IPRs] from placing raw sugar under loan" except that they needed it for refining. *Id.* at 154. Asked what, then, was the difference between C & H's and the IPRs' commitments of their raws to refining, Mr. Agnew replied,

The principal difference in the commitment is that C & H must first market or sell the sugar before prices can be established for settlement with the producers.

IPRs' settlement with producers does not in any way depend on the sale of sugar.

*Id.* at 161. Regarding whether this distinction affected the necessity of C & H's receiving raw sugar in order to operate, Mr. Agnew agreed with the statement that "in that sense, the commitment of an IPR's raw sugar to its refinery is exactly the same as the commitment of Hawaiian raw sugar to the C & H refineries, ..." *Id.* at 161–62.

ASCS official Stansberry, also asked in deposition to distinguish the two types of commitment, stated that "[i]n the case of the IPRs, there is no option. It belongs to the refiner as soon as it is produced." C & H in contrast, may sell raw sugar to other refiners if that sugar is in excess of its needs. "I know of no case where an IPR has sold its own raw production to another refiner." Stansberry Dep. at 47. A "much more important distinction than the commitment," in Mr. Stansberry's mind, was the difference in the basis for their growers' compensation between C & H and the IPRs, although this distinction did not affect the nature of the commitment of raw sugar to refining. *Id.* at 50.

On December 15, 1980, the USDA denied plaintiffs' request for relief. Stating that "the primary issue is whether the structure of the 1977 payment and loan programs was such that it effectively denied C & H the possibility of receiving price support for its entire 1977 crop...," the Secretary's letter summarized C & H's position (1) that its raw sugar was committed to refining and hence "from a practical point of view" unavailable for placement under the loan program and (2) that C & H's operation

was similar to that of the IPRs. To the first contention, the Secretary responded:

Our review indicates that ... C & H did have the opportunity to place raw sugar under loan. The decision not to place raw sugar under loan but instead to utilize that sugar in its refinery operations was an economic decision by C & H. This conclusion is supported by the fact that C & H did participate in the 1978 loan program ... and did forfeit substantial quantities of raw sugar under that program.

Accordingly, the regulations "fairly and reasonably carried out the intent of Congress that the entire 1977 crop of sugar beets and sugarcane have price support available to it."

To C & H's second contention, the Secretary replied that there were important differences between C & H and the IPRs and Puerto Rican processors:

Most importantly, in the case of the latter two operations, the return to the grower is based upon the price of raw sugar, rather than the price of refined sugar, as is the case with C & H. This is a critical difference. A payment program based upon processor's sales receipts is a rational method of price support to growers only to the extent that such sales receipts are the basis for grower payments. It is, therefore, conceptually incorrect to make payments to C & H on the basis of the transfer of raw sugar from Hawaii to the California refinery, because such transfer has no economic significance in terms of determining the amount of the ultimate return to the grower. Since Hawaii produces almost 20% of U.S. sugar, *divorcing the event which triggers payment program coverage from the event (i.e., sale of the refined sugar) which determines the amount of the return to the grower would almost certainly produce distorted and incorrect payment rates,* not only for C & H but also for all other program participants.

(Emphasis added.) According to the Secretary, changing the regulations retroactively

would be unfair to other processors which were not afforded this opportunity, because such changes "have been made only when ... necessary to guarantee that the entire 1977 crop ... had price support available to it ...." C & H's entire crop had such price support available to it.

## DISCUSSION

As plaintiffs correctly point out with respect to the second rationale for the Secretary's decision, the original concept of identifying the event triggering program coverage ("marketing") with the event which fixes the price paid to growers was abandoned after the USDA began amending the regulations to "cover in" "gap" sugar. The "divorcing" of these two events in the case of future delivery contracts did not produce any "distortion" in the computation of average market prices, because the regulations were simultaneously amended, per C & H's recommendation, *see supra* note 3, so as to include sales subsequent to November 8 in the computation of the averages for the payment periods in which they occurred. Plaintiffs are not claiming payments based on the high rate established for the first payment period ending November 7, but based on the rates established for the subsequent payment periods in which the refined product actually was sold and its price determined.

C & H and the IPRs cannot be distinguished for purposes of determining when their sugar was marketed based on their differing bases for determining compensation to growers. That problem (of converting C & H's compensation to its growers to a "raw sugar price equivalent basis") was solved for purposes of including C & H in the computation of the average market prices by the simple expedient of deducting eight percent from the proceeds of C & H's refined sugar sales. *See supra* note 2. The IPRs' exclusion from those computa-

tions indicates, if anything, a greater degree of difficulty in computing a raw sugar price equivalent for the IPRs' than for C & H's proceeds for purposes of comparing the processed product of the two entities with that of other processors. Judging from the materials before the Secretary, the transfer of raw sugar from the processing to the refining divisions of the IPRs does not have a whit more economic significance than the transfer from plaintiffs to C & H.

The court is unable to discern any rational basis for the Secretary's insistence that the event fixing the price paid to C & H's producers (sale of refined sugar) be the same as the event triggering program coverage (or exclusion) for such sugar, while not insisting on this in the case of the second proviso processors. Therefore, if any rational basis exists for allowing the economically irrelevant event of transfer of raw sugar to the refineries to trigger program coverage in the IPRs' case, but not in C & H's, the Secretary's second rationale does not supply it. The sole surviving purpose of defining a marketing period, so far as one appears from the record, is to identify that portion of the sugar crop which is unable (because it has already been sold or committed for the future) to avail itself of the loan program. Indeed, the payment program itself has been characterized by one court as "an interim measure designed to offer a price support for 1977 sugar which had already been marketed and could not therefore qualify for the loan program. Subsection f(3) of 7 U.S.C. § 1446 ... so provided." *Amalgamated Sugar Co. v. Bergland,* Civ. No. 78–1245, slip op. at 3. (D.Idaho July 18, 1980).

Defendant nonetheless argues that plaintiff should be held to the consequences of its obsolete June 1977 recommendation on when marketing should be deemed to occur.[10] Claiming that "plaintiffs concede

---

**10.** In addition to denying that circumstances changed after July 1977, defendant's position ignores C & H's recommendation in its October 14, 1977 letter, *see supra* note 3, that no payments be made on sugar delivered after the payments program was superseded; its expres-

sion of concern that it will have to pay growers the support rate as to the whole crop even if the payment program is superseded before the whole crop is sold; and its recommendation of an adjustment to the grower support rate. In effect, C & H foresaw the problem of the "gap,"

that no change in the relevant facts regarding the Hawaiian industry has occurred" since then, Def's Reply filed Feb. 7, 1983, at 2, defendant quotes the statement of C & H's Donald Falconer in deposition on the subject of the original recommendations: "There's certainly no factual misrepresentation. The facts that are put forward there are absolutely correct." Falconer Dep. at 210. Yet the immediately preceding sentence completely undercuts defendant's point: "I don't think there's anything in there that's improper *given the circumstances in which it was said.*" (Emphasis added.) Citing to the same page of testimony, Def's Mot. filed Dec. 23, 1982, at 25, counsel for defendant characterizes plaintiffs' present position, in view of "their concession" that there has been no change of circumstances, as "certainly courageous" but "facially absurd." This kind of argument runs athwart of Chief Judge Markey's admonition in *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1485–86 (Fed. Cir.1984).[11]

Defendant argues that the de la Garza amendment did not mandate the same level of support for the entire 1977 crop. The statute does not require that all growers receive equal levels of support, or that processors receive anything at all. According to defendant, the statute requires only that the minimum level of support be made available to growers on the entire crop. Citing *Amalgamated Sugar Co.*, defendant appears to take the position that the language of the conference committee report regarding the goal that "a substantially equal level of price support be provided for all sugar cane and sugar beets of the 1977 crop" refers to no more than the availability of this minimum support level on the whole crop and that this language cannot be allowed to control the plain meaning of the statute or be elevated to the level of a statutory mandate. Def's Resp. filed Jan. 26, 1983, at 4–5; *see Amalgamated Sugar Co. v. Bergland,* Civ. No. 78–1245, slip op. at 10–11.

In that case plaintiffs challenged the legality of the Secretary's allegedly providing beet processors a level of loan support that was lower than the level of payments under the payment program, resulting in greater support being given to those marketing their sugar earlier. Plaintiffs also alleged that growers which had one type of contract with their processors received less support as a result than those with another type. Adopting essentially the same interpretation of the statute that defendant urges, the court held that the law did not require the Secretary to provide equal levels of support under both programs, as long as the minimum was provided, and denied plaintiffs' motion for summary judgment. Noting, however, that "[c]onflicts appear in the statements of [James Agnew in deposition and affidavits] regarding the reasons or motivations of the Secretary in adopting the support program in issue and in making the basic determinations necessary to formulate the program," the court denied defendant's motion for summary judgment and tried the issue of "whether the Secretary acted arbitrarily or capriciously ... in determining the support price for the loan program." *Id.* at 15.

It emerges from the factual findings in *Amalgamated Sugar Co.* that the supposed higher payment program rate really was

recommended against USDA's solving the problem by the device it later used to help the IPRs and the sellers of second proviso sugar, and recommended an alternative solution to the problem. Yet defendant relies on this letter as reaffirming plaintiffs' original position. Now that the Secretary has adopted the solution which plaintiffs opposed, it is not inconsistent for them to seek its benefits along with everyone else.

11. Defendant also claims that, at the time when the loan program regulations were first promul-

gated, plaintiffs provided extensive comments on them "without once even implying that the loan program was not available to them," Def's Resp. filed Jan. 26, 1983, at 6, and that their "reversal of position" afterwards "is, therefore, lacking in credibility ...." *id.* at 7. In support of this latter allegation, defendant quotes part of C & H's November 29, 1977 letter to Robert Stansberry, page 3 of which complains precisely of plaintiffs' inability to participate in such a loan program as to more than 100,000 tons in any year. *See supra* note 8.

the conversion rate between beet and raw cane sugar proceeds for determining the national average price. The difference in the purpose of the two rates explained the difference between them. It was impossible to structure the two programs so that they would have the same impact on participants. To attempt to do so would have produced market distortions, thereby skewing the relationship between beet and cane sugar support levels. In fact, participants under neither program fared worse than those under the other. Findings of Fact ¶¶ 26–28, 33–34, 37, 40, 44–45, 52. The Secretary's actions were found to be rational.

In framing the issue in this case to parallel that in *Amalgamated Sugar Co.*, defendant has set up a straw man. Plaintiffs here contend not that they were denied support equal to that accorded the IPRs, but that, as a practical matter, part of their crop was denied support altogether, unlike that of the IPRs. This disposes of defendant's argument that plaintiffs "fared better" than the IPRs "in terms of payment received per pound of total crop." Def's Mot. filed Dec. 23, 1982, at 29. Plaintiffs accurately state that they received a larger subsidy per pound of sugar only because most of their sugar was sold at earlier dates when prices were lower. Thus, plaintiffs "fared exactly as the Congress and the Department expected them to fare with respect to that portion of their crop which received price support." Plfs' Opp. filed Jan. 4, 1983, at 14–15. In contrast to the IPRs, however, plaintiffs did not receive subsidies for their entire crop. That is the issue.

Secondly, unlike plaintiffs in *Amalgamated Sugar Co.*, plaintiffs here are not merely alleging a right to have the Secretary "grant an adjustment where the grower has by contract put himself in what turned out to be a disadvantaged position." *Amalgamated Sugar Co.*, slip op. at 14. They claim that the Secretary acted arbitrarily and capriciously in adjusting the payments program so as to accommodate the situation of other processors whose sugar fell into the "gap", while refusing to do the same for plaintiffs. Plaintiffs' claim does not depend on a finding that the Secretary's administration of the loan program violated his statutory mandate under the de la Garza amendment. Rather, plaintiffs claim that the Secretary was inconsistent in administering the payment program. This was manifested by his interpreting and later changing the regulations to accommodate and "cover in" the IPRs, but not plaintiffs, and, in general, administering the program in such a way as to make it a fall-back, substitute program for that portion of the 1977 crop of others which, by force of circumstances, could not take advantage of the loan program, yet not affording this alternative to plaintiffs.

Regardless of Congress' true intent in enacting the de la Garza amendment, the whole course of the Secretary's administration of the payments program demonstrates his understanding that Congress intended that the entire crop receive substantially equal support under one program or the other. *See* Stansberry Dep. at 19–20. In a November 2, 1977 letter to Senator Bob Dole, Secretary Bergland, quoting 7 U.S.C. § 1446(f)(3), wrote:

Clearly, Congress intended that the interim program be implemented. Furthermore, the interim program is *not* a substitute for the permanent program, but is complimentary [sic] to it. The two programs together will insure that all producers are treated alike and none are disadvantaged.

(Emphasis in original.) Defendant therefore sets up another straw man when it argues that the statute does not require all growers to use the program, or that they all receive equal payments, because this would involve intrusion into the sugar industry's business practices.

The core of plaintiffs' legal argument is that "Government is at its most arbitrary when it treats similarly situated people differently." *Etelson v. OPM*, 684 F.2d 918, 926 (D.C.Cir.1982); *see Squaw Transit Co. v. United States*, 574 F.2d 492, 496 (10th Cir.1978) (FCC's inconsistency in similar

circumstances in granting certificates of convenience lacks rationality and is arbitrary); *Contractors Transport Corp. v. United States*, 537 F.2d 1160, 1162 (4th Cir.1976) (same); *Farrell Lines, Inc. v. United States*, 204 Ct.Cl. 482, 505–06, 499 ·F.2d 587, 601–02 (1974) (agency must be consistent in determining eligibility of items for subsidies under subsidy contracts). *AMI-Chanco, Inc. v. United States*, 217 Ct.Cl. 76, 576 F.2d 320 (1978), is instructive. In that case this court's predecessor invalidated as arbitrary and capricious Medicare Program regulations denying reimbursement to Medicare providers for stock maintenance costs. Observing that other regulations allowed reimbursement for similar costs, such as general administrative and accounting costs, the court found the challenged regulations "so inconsistent with the statutory purpose and other regulations of the same agency that we cannot uphold ... [the challenged regulations]." *Id.* at 87, 576 F.2d at 326.

This case does not present a situation of one entity's competitive position being strengthened as a means of achieving a valid governmental objective; consequently, defendant's cases on point are inapposite. In *Air Transport Ass'n v. FEO*, 382 F.Supp. 437 (D.D.C.1974), *aff'd*, 520 F.2d 1339 (Temp.Emer.Ct.App.1975), associations of air carriers challenged the regulatory treatment of aviation fuel under the Emergency Petroleum Allocation Act of 1973 (the "EPAA"). Under the regulations 100 percent of refiners' increased costs theoretically could be allocated to the price of aviation fuels, to the disadvantage of air carriers relative to other customers. The purpose of the EPAA, however, was to empower the President to set priorities among users of fuel so as to minimize economic dislocation caused by fuel shortages. *Alabama Power Co. v. Ickes*, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938), involved a challenge to NIRA loans and grants to municipalities in aid of power plant construction. The competitive injury done to an existing power company was held to constitute *damnum absque injuria. Id.* at 479, 58 S.Ct. at 303. In *Ala-*

*bama Power Co.*, it was the Government's objective to benefit the cities and not the privately-owned power company. *United States v. Rock Royal Coop.*, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939), presents a similar situation. Regulations affording especially favorable treatment to dairy farmers' cooperatives under a program like the payment program in the case at bar were challenged by the cooperatives' rivals. Observing the existence of a congressional policy of encouraging cooperatives, *id.* at 562–64, 59 S.Ct. at 1007–1009, the court rejected the challenge. *See also Hiatt Grain & Feed, Inc. v. Bergland*, 446 F.Supp. 457, 485, 508–10 (D.Kan.1978), *aff'd*, 602 F.2d 929 (10th Cir.1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980). A very different situation is presented by cases wherein improving one entity's competitive position neither is a proper objective under an enactment nor serves as a means of achieving a proper objective. *See United States v. Swift & Co.*, 152 F.Supp. 738, 753 (D.Md.1957).

Plaintiffs do not complain that a uniform application of a rational regulatory scheme has produced different results for them than for the IPRs, as did plaintiff in *Phillips v. Simpson*, 353 F.Supp. 1139 (E.D.Ky. 1973). Plaintiff there alleged that farms of similar size in the area had been allotted larger tobacco quotas. Holding that the unequal allocation was " 'not illegal if it is in accord with valid regulations,' " *id.* at 1143, the court relied on *Wright v. Darnell*, 205 F.Supp. 277, 279 (E.D.Ky.1962), in which the court had observed that "the available crop land is merely one of numerous factors to be considered in the allotment of tobacco acreage." Thus, *Phillips* was not a case of similarly situated persons being treated differently. *See Contractors Transport Corp.*, 537 F.2d at 1162.

Finally, plaintiffs do not make a mere "general allegation of discriminatory treatment." Def's Resp. filed Jan. 26, 1983, at 3. In *Carruth v. United States*, 224 Cl.Ct. 422, 445, 627 F.2d 1068, 1081 (1980), cited by defendant on point, plaintiffs, peanut growers, asserted a claim based on denial

of equal protection and due process of law over which the United States Court of Claims held that it lacked jurisdiction. Plaintiffs in the case at bar have made no such mistake. Secondly, plaintiffs in *Carruth* submitted to the onerous restrictions challenged there as a condition of receiving subsidies for their peanuts. *Id.* at 446, 627 F.2d at 1081. It does not appear that the peanut sheller/handlers, whose exemption from the restrictions formed the basis of plaintiffs' claim of discrimination, were eligible to receive the subsidies.

The record, as it stands, does not enable the court to discern a path which the Secretary rationally might have taken to reach the conclusion that the transfer of the IPRs' sugar from their processing divisions to their refineries was distinguishable from the transfer of plaintiffs' sugar to C & H for purposes of the payment program. Defendant argues that the loan program was less accessible to the IPRs than to plaintiffs, because although C & H sells some raw sugar, refined sugar is all that the IPRs sell and for that reason the IPRs, unlike C & H, did not participate in the 1978 loan program. C & H, however (which placed 182,100 tons under loan in 1978 and 165,000 tons in 1979, Hare Aff. ¶ 33), had sold all of its 1977-crop raw sugar in excess of its refineries' demands early in the year (174,244 tons in all, according to Mr. Jaenke's letter). C & H had time to plan in advance to take advantage of the 1978 and 1979 loan programs. Thus, the fact that it placed sugar under loan in those years does not indicate that it could have done so in 1977. It was arbitrary and capricious for the Secretary to ignore these key factors in determining that C & H had sugar available to be placed under loan and to look no further than the fact that the sugar was physically there. *See Asarco, Inc. v. EPA,* 616 F.2d 1153, 1161–62 (9th Cir.1980); *United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240, 252–53 (2d Cir.1977); *Appalachian Power Co. v. EPA,* 477 F.2d 495, 507 (4th Cir.1973). Moreover, as Mr. Agnew admitted, the IPRs could have sold raw sugar if they wished and could have placed raw sugar under loan.

It is true that the IPRs buy much of their raw sugar from independent processors and are, with respect to that sugar, essentially in the refining business. The Secretary might have concluded that it would be unfair to require the IPRs to change the nature of their business by becoming, in effect, a mere conduit for that sugar. But this would not be an issue if, as presumably was the case, that sugar was subsidized via payments not to the IPRs, but to the IPRs' suppliers of ready-processed sugar. At any rate, nothing in the record indicates that this sort of reasoning was what underlay the Secretary's decision. *See SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *Contractors Transport Corp.,* 537 F.2d at 1162. At any rate, according to James Walczak's July 25, 1979 memorandum, South Coast "views itself primarily as a grower and as a processor, rather than as a refiner."

Defendant's other arguments showing that C & H could have availed itself of the loan program apply with equal force to the IPRs. For example, defendant argues that C & H could have purchased foreign raws to place under loan (which clearly would have undermined the whole program), or curtailed or shut down its refinery operations for short periods, *see* Hare Dep. at 91, or placed refined sugar under loan. Defendant further argues that plaintiffs' decision not to place sugar under loan was merely a business or economic decision based on C & H's desire to maintain its marketing position and on the economic benefits derived by plaintiffs from operating a refinery.

Defendant also argues that other producers were treated similarly to plaintiffs. Sugar sold by the Florida Terminal Marketing Cooperative was considered marketed when sold by the cooperative, not when transferred from processors to the cooperative. The Florida cooperative sold raw sugar, however, and thus did not have plaintiffs' problem of having to keep refineries operating.

Defendant claims that beet processors, too, were placed in the same dilemma as plaintiffs. Beets were harvested late in the year, and therefore beet processors, like C & H, were forced to choose between placing their sugar under loan and continuing to supply regular and prospective customers with sugar. According to Mr. Agnew's supplemental affidavit, most beet processors did not participate in the 1977 loan program. Those that did probably had carryover stocks from 1976. No 1977-crop beet sugar was forfeited under the 1977 loan program, whereas large amounts were forfeited under the 1978 program. Suppl. Agnew Aff., Jan. 24, 1983, ¶ 7. The court did not accept plaintiffs' argument on point. *See supra* note 9. Of course, utilizing the loan program, which effectively introduced the Government as an alternative customer for sugar, inevitably involved sending other customers away. The choice made the loan program less palatable and, in that sense, less accessible than the payments program. To the extent that defendant relies on the contention that the Secretary could not remedy this inherent disadvantage of the loan program without substituting the payment program for the loan program entirely, contrary to Congress' intent in enacting the de la Garza amendment, defendant's position is unassailable. But defendant's comparison between C & H's and the beet processors' dilemma does not address the issue of C & H's inability to keep its refinery going with 190,000 tons of its raw sugar in storage. The Secretary solved this problem for the IPRs, but not for plaintiffs.

Defendant makes the *in terrorem* argument that if plaintiffs are to be treated identically to the IPRs in all respects, then their proceeds, like the IPRs', must be excluded from the computation of national average market prices. *See supra* note 2. Because plaintiffs' proceeds were below average, this exclusion would result in raising the national average prices. The Govern-

ment then would have to retrieve overpayments already made to processors, and plaintiffs' recovery would be offset. Def's Resp. filed Jan. 26, 1983, at 12–13 (citing Suppl. Agnew Aff. Jan. 24, 1983, ¶ 4). Of course, plaintiffs are not suggesting that they should be excluded from the average price computations. A satisfactory method exists under 7 C.F.R. § 1435.7 for converting C & H's proceeds into a raw sugar equivalent price. No good reason appears for tampering with this aspect of the program.

Finally, defendant argues that perhaps the IPRs received a "windfall" and that the court should not compound the Secretary's error by revising the regulations to grant plaintiffs a windfall. This argument has been aptly characterized by plaintiffs, Plfs' Reply filed Feb. 9, 1983, at 13, as "the ultimate *post-hoc* rationalization." *See Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962).[12]

Plaintiffs urge that a remand to the Secretary for reconsideration in this case would be an "empty ritual," Plfs' Mot. filed Dec. 22, 1982, at 39 (citing *Maxwell Dynamometer Co. v. United States,* 386 F.2d 855, 870, 181 Ct.Cl. 607, 631 (1967)), because "the record demonstrates the 'legal possibility of only one conclusion,' *Douglas v. United States,* 576 F.2d 887, 895 n. 26, 217 Ct.Cl. 97 (Ct.Cl.1978) ...." Here the agency analysis stopped at the determination that plaintiffs' sugar was available for loan because it was available in a physical sense. In cases such as this where the agency's course of inquiry or the grounds invoked for the agency decision are inadequate, the "preferred procedure," *Public Power Council v. Johnson,* 674 F.2d 791, 794 (9th Cir.1982), is for the court to remand to the agency for further consideration "and not compensate for the agency's dereliction by undertaking its own inquiry into the merits." *Asarco, Inc. v.*

---

**12.** Of course, it is too late to revise the 1977 loan program retroactively—another alternative solution proposed by defendant. *See* 45 Fed.Reg. 48,866 (1980).

Any of defendant's arguments not herein addressed have been considered carefully by the court and found to lack merit.

*EPA,* 616 F.2d at 1160; *see id.* at 1159; *Amoco Production Co. v. NLRB,* 613 F.2d 107, 111 (5th Cir.1980); *Squaw Transit Co.,* 574 F.2d at 496; *Contractors Transport Corp.,* 537 F.2d at 1162; *National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688, 701 (2d Cir.) *cert. denied,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975); *Exxon Corp. v. DOE,* 91 F.R.D. 26, 34 (N.D.Tex.1981); *St. Joseph's Hospital v. Blue Cross,* 489 F.Supp. 1052, 1062–63 (N.D.N.Y.) *aff'd,* 614 F.2d 1290 (2d Cir. 1979). The court perforce was required to examine the merits in order to ascertain whether the Secretary's action was arbitrary or capricious. *See, e.g., Asarco, Inc.,* 616 F.2d at 1160.

### CONCLUSION

Based on the foregoing,

IT IS ORDERED, as follows:

1. Defendant's motion for summary judgment is denied, and plaintiffs' is granted to the extent consistent herewith.

2. Pursuant to RUSCC 60.1(a)(1), this case is remanded to the Secretary of Agriculture.

3. The Secretary will review the record, and, to the extent that no record survives of negotiations contemporaneous with the former Secretary's original decision, will supplement the record as he sees fit in order to determine the availability to C & H of raw sugar for placement under loan in 1977 without disruption of its refining operations.

4. Based on this review, and consistent with this opinion, the Secretary shall state reasons why plaintiffs should or should not be treated differently from the IPRs under the 1977-crop raw sugar price support payment program and, if a decision is rendered in plaintiffs' favor, the amount of judgment that shall enter for plaintiffs.

5. Expedition is of the essence. Although the delays in this case are not the fault of the Department of Justice or the USDA, plaintiffs should not sustain any further delay. Proceedings in this court are stayed for a period not to exceed 90 days following service of this order and opinion by the Clerk of the Court to the Secretary. By the end of this period, the Secretary shall issue and transmit his decision or final action and statement of reasons therefor to the parties and the court.

