816 F.2d 629
 HILO COAST PROCESSING COMPANY, et al., Appellants,
and
California and Hawaiian Sugar Co., Third Party Appellant,
v.
The UNITED STATES, Appellee.
 Appeal No. 86-681.
 United States Court of Appeals,
Federal Circuit.
 April 14, 1987.
 
 Stephen A. Zovickian, McCutchen, Doyle, Brown & Emersen, of San Francisco, Cal., argued for appellants. With him on the brief was Loyd W. McCormick.
 Linda Lance, Dept. of Justice, of Washington, D.C., argued for appellee. With her on the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Terrence Jackson and John R. Lom, Office of the General Counsel, Dept. of Agriculture, of Washington, D.C., of counsel.
 Before FRIEDMAN, Circuit Judge, BALDWIN,* and MILLER, Senior Circuit Judges.
 JACK R. MILLER, Senior Circuit Judge.
 
 
 1
 This appeal is from the Claims Court's judgment filed September 20, 1985, ordering dismissal of plaintiffs' complaint following the granting of defendant's motion for summary judgment and the denial of plaintiffs' like motion. We reverse and remand.
 
 BACKGROUND
 
 2
 Claims Court's Published Opinion (Jan. 8, 1985)
 
 
 3
 The first and only published report of this case is at 7 Cl.Ct. 175 (issued January 8, 1985), familiarity with which will be assumed because of the length of the opinion. Subsequent Claims Court orders and opinions are summarized and discussed in turn.
 
 
 4
 On January 8, 1985, on cross-motions for summary judgment, the Claims Court held that refusal by the U.S. Department of Agriculture (USDA) to amend a regulation (providing for price support payments to growers of sugar cane) was arbitrary and capricious in view of its finding that different treatment was accorded similarly situated sugar cane growers. Intervening amendments to the regulation were found to have left plaintiffs singled out for special and seemingly unfair treatment. If any rational basis existed for allowing the economically irrelevant event of transferring raw sugar to refineries to trigger program coverage in the case of Louisiana-based integrated processor-refiners (IPRs), but not in appellants' case, the Claims Court declared that the Secretary of Agriculture's rationale did not supply it.
 
 
 5
 Accordingly, the case was remanded to the Secretary to review and supplement the record as he saw fit to determine whether, unlike the IPRs, appellants (collectively "C & H") could have pledged raw sugar under the 1977 loan program without disruption of C & H's refining operations. If so, C & H had price supports available to it under the loan program and could not complain that it was excluded from participating in the payment program. (The IPRs were allowed to participate in the payment program because they effectively were unable to pledge sugar under the loan program.) The court instructed the Secretary to state the reasons why plaintiffs should be treated differently from the IPRs.
 
 
 6
 Secretary's Memorandum of Determination (April 12, 1985)
 
 
 7
 On April 12, 1986, the Secretary filed with the Claims Court a "MEMORANDUM OF DETERMINATION" in response to the court's order. The rationale supplied by the Secretary is summarized below:
 
 
 8
 On November 8, 1977, after normal rule making procedures had been suspended, a loan program that replaced the earlier payment program was implemented. In accordance with legislative intent, the payment and loan program regulations were written so that, between the two programs, processors would have the opportunity to obtain price support for the entire 1977 crop. The definition of "marketing" under the payment program, which triggered eligibility for payments, did not include internal transfers of sugar from a processor to a refiner if the transfer occurred within an integrated processing and refining operation like C & H's. Instead, payments to such entities were made when the refiner sold sugar to third parties. After the loan program was implemented in late 1977, several IPRs approached USDA officials and argued that the IPRs were at an unfair competitive disadvantage (under the payment program) with other non-integrated Louisiana processors that were eligible for payments for sugar sold to refineries before November 8, 1977. In response, the officials orally advised the IPRs that their internal transfers of raw sugar would be considered "marketing," and would thus be eligible for payments.
 
 
 9
 Earlier, an internal USDA memo had recognized that the loan program's rapid implementation had left sugar committed for sale but not sold by November 8, 1977 without any form of price support. (Because sugar had to be pledged to the government to secure a loan, sugar under commitment but not yet sold was not available for use under the loan program.) The memo suggested that payment program regulations should be amended to make sugar committed but not sold by November 8, 1977 eligible for payments. This suggestion was adopted in late December when the regulations covering non-integrated processors were amended to "cover" the "gap" in sugar price supports. Although the memo and amendment did not address vertically-integrated processors, USDA's advice to the IPRs was based on the conclusion that the commitment of sugar to their refineries was analogous to sugar committed but not sold by non-integrated processors. After this advice was given, the price support programs for the 1977 crop were audited by the USDA Inspector General, who recommended that USDA seek to recover from the IPRs substantially all of the payments made to them under the payment program. According to the Inspector General, these payments were unauthorized and inconsistent with regulations.
 
 
 10
 USDA sought concurrence of the General Accounting Office (GAO) in amending the 1977 payment program regulations to retroactively authorize the payments made to the IPRs. Without the retroactive amendments, it was said that USDA would be compelled to seek return of price support payments from the IPRs.
 
 
 11
 The basis of USDA's position was that the IPRs had reasonably relied on advice of USDA officials, and to renege on that advice, after the payment program had ended in late 1977, would have effectively denied price support to the IPRs for a portion of the 1977 crop. This, it was argued, would be inconsistent with Congressional intent.
 
 
 12
 The Comptroller General concurred--provided the Secretary determined that, absent such retroactive amendments, there would be an effective denial of price support for a portion of the 1977 crop. So finding, USDA retroactively amended the payment program regulations on July 22, 1980, to conform them with the oral advice given by USDA officials to the IPRs in late 1977. However, under the terms of the amendment, C & H was still excluded from participating.
 
 
 13
 When the amendment was published, C & H petitioned USDA to amend the 1977 payment program regulations again to cover the Hawaiian sugar industry under the definition of "marketing" so that, much like the IPRs, the contractual marketing arrangement between Hawaiian processors and C & H would be considered a marketing. This would have effectively accelerated the marketing of Hawaiian sugar so that the portion of the Hawaiian sugar crop committed to C & H's refineries (and thus not available for use in the loan program) but not yet sold on November 8, 1977 would have been covered by the payment program. USDA rejected the petition.
 
 
 14
 According to the Secretary, the issue was whether there was an effective denial of price support to the Hawaiian sugar industry for that portion of the 1977 crop which was not eligible for the payment program under existing regulations. The Secretary found that C & H could have participated in the loan program, although C & H would have been required to divert raw sugar from its refinery operations and/or import foreign raw sugar for such operations in order to participate. The same was true of the IPRs, but the Secretary concluded that this, alone, did not make the IPRs and C & H "similarly situated" for purposes of the 1977 payment program. The Secretary stated that C & H had, at all times, the knowledge and information necessary to enable it to make considered business decisions on whether it would participate in the loan program; whereas, the IPRs did not know what portion of their 1977 sugar production was eligible for either program.
 
 
 15
 As to whether economic unavailability of the loan program was a sufficient basis for retroactively amending the payment program regulations to include C & H, the Secretary stated that economic availability was not relevant in determining whether price support was made available. Thus, the Secretary determined that price support was available for the entire 1977 crop of Hawaiian sugar cane because C & H had physical possession of raw sugar, although it may have been economically prohibitive to participate in the program.
 
 Claims Court's Order (June 21, 1985)
 
 16
 In response to the Secretary's Determination, on June 21, 1985, the Claims Court issued a bench ruling which stated that the Secretary had again failed to distinguish between the IPRs and C & H for the purpose of receiving payments under the payment program. At the same time, the court denied the plaintiffs' request that judgment be entered in their favor. Instead, the Claims Court again remanded the case to the Secretary, presenting him with three options: (1) to meaningfully differentiate between C & H and the IPRs (thus permitting the IPRs to retain the payments they had received and denying relief to C & H), which the court said had not been done; (2) to treat C & H in the same way as the IPRs had been treated (thus granting C & H relief); or (3) to treat C & H and the IPRs the same way by recouping from the IPRs the payments they had received pursuant to incorrect advice from USDA officials. "What we have here," said the court, "is a failure to treat like situated entities equally."
 
 The court directed the Secretary to:
 
 17
 review the record with the objective of treating plaintiffs in the same manner as the IPRs under the 1977-crop raw sugar support payment program. If a decision is rendered to treat plaintiffs and the IPRs in the same manner by making the full benefits of the payment program available to plaintiffs, the Secretary shall state the amount of judgment that shall enter for plaintiffs, consistent with this court's opinion and order reported at 7 Cl.Ct. 175, 179 n. 2, 194 (1985). If the Secretary determines to treat plaintiffs and the IPRs in the same manner by repealing the regulation and recouping from the IPRs the monies paid them, the Secretary shall so state and, in addition, shall set forth the mechanism that has been adopted to implement that decision. If the Secretary determines to treat plaintiffs and the IPRs in the same manner by declaring the regulation in error, repealing it, but deciding pursuant to 7 U.S.C. Sec. 1339a (1982), that the money relief previously given the IPRs should not be recouped, the Secretary shall state his reasons therefor, including cases and other authorities supporting the application of section 1339a in the circumstances of this case.[1]
 
 
 18
 Order of June 21, 1985 at 1.
 
 
 19
 Supplementary Determination of the Secretary (July 22, 1985)
 
 
 20
 In response to the second remand, the Secretary stated that, in view of the Claims Court's decision, C & H and the IPRs should be treated the same. To wit, both should be considered ineligible for price supports under the payment program for sugar not sold by November 8, 1977. However, the Secretary determined that the IPRs should be granted relief under 7 U.S.C. Sec. 1339a and that they should retain the payments that were made. He pointed out that the advice the IPRs received was supplied by USDA officials responsible for day-to-day operational matters for the program and declared that failure to grant such relief "would be unfair and inequitable"; further, that even if recoupment against the IPRs would not lead to an attempted recoupment in turn against producers, it would impose a windfall loss on the IPRs because they would have already paid out the support payments to producers. "Losses of that kind," he stated, "if imposed on commodity industries in connection with price support programs, would undermine USDA programs to the detriment, ultimately, of producers."
 
 Claims Court's Order (Sept. 27, 1985)
 
 21
 Upon consideration of the Secretary's Supplemental Determination, the Claims Court held that the decision of the Secretary to treat plaintiffs and the IPRs in the same manner but to permit the IPRs to retain the payments conferred by the July 1980 amendment was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The court referred to its bench ruling of June 21, 1985, which stated that the Secretary's rationale for distinguishing between C & H and the IPRs, based on the inability of the IPRs to make an informed hard choice,[2] was unsupported by substantial evidence, but the court concluded that section 1339a authorized the Secretary to allow the IPRs to retain the payments that the Secretary indicated in his Supplementary Determination should not have been extended in the first place.
 
 OPINION
 
 22
 Unlike the Claims Court, whose analysis and logic we have followed until its unpublished order of September 27, 1985, we conclude that the Secretary's determination that neither C & H nor the IPRs was eligible for the payment program for the involved sugar cane was incorrect as a matter of law. His determination rests on the premise that the internal transfer of raw sugar to their refinery operations did not constitute a "marketing" for purposes of the program. However, not only does this represent a reversal of the Secretary's earlier position--a retroactive rescission of the so-called "third proviso" added to Section 1435.3(d) of the regulations (see, Greene v. United States, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964)), it flies in the face of Congressional intent demonstrated in the Conference Report on the Food and Agriculture Act of 1977 (7 U.S.C. Sec. 1446(f)). This Act substituted the loan program for the payment program with the understanding that no disruption in price support for any portion of the 1977 crop would occur. The Conference Report states:Consistent with existing law, the added language ... makes clear the Conferee's intent that fair and equitable treatment be afforded all domestic producers by extending price support to that portion of the 1977 crop marketed before the new program can be made effective, it being a purpose of this section that a substantially equal level of price support be provided for all sugar cane ... of the 1977 crop. [H.Conf.Rep. No. 599, 95th Cong., 1st Sess. 174, reprinted in 1977 U.S.Code Cong. & Ad. News, 1704, 2445, 2474.] [emphasis added.]
 
 
 23
 Failure to administer the support programs so that both C & H and the IPRs would be eligible for price supports would clearly frustrate the Congressional purpose of providing price support for all sugar cane of the 1977 crop, either by payments or through loans. That frustration is not excused by the difference in knowledge of the applicability of the regulations between C & H and the IPRs, particularly in light of the relief the IPRs received--initially through USDA advice, then under the third proviso, and presently under 7 U.S.C. Sec. 1339a. Although the Secretary's determinations are entitled to substantial deference, these determinations cannot be inconsistent, as here, with what Congress clearly intended. See, Teamsters v. Daniel, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979); Al Tech Specialty Steel Corp. v. United States, 745 F.2d 632, 642 (Fed.Cir.1984). The Secretary failed to give due consideration to this point. Thus, contrary to the dissenting opinion, a rational basis for the Secretary's decision has not been shown. See, Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).
 
 
 24
 Under the circumstances, the Secretary's statement, that economic availability of the loan program is not a relevant consideration, ignores the purpose of the statute--to provide a minimum level of uninterrupted economic support. If, as the Secretary had earlier determined, the cost of diverting or importing sugar to participate in the loan program outstripped the benefits, the loan program effectively was not available.[3] Thus, the Secretary could qualify the involved portion of the 1977 crop under the payment program (which was done with non-integrated processors via the December 28, 1977 amendments), or exclude that portion of the crop from the program. One option would follow the intent of Congress; the other would frustrate it. Under these circumstances, the Secretary erred in choosing an option that was plainly inconsistent with the origin, purpose, and language of the statute.
 
 
 25
 Moreover, as the Claims Court found, the "plaintiffs were singled out for special and seemingly unfair treatment"--not the "fair and equitable treatment" mandated in the Conference Report. This, we hold, was arbitrary, capricious, an abuse of discretion, and contrary to law.[4]
 
 
 26
 Reversed and remanded for appropriate instructions to the Secretary in light of this opinion.
 
 REVERSED and REMANDED
 
 27
 FRIEDMAN, Circuit Judge, dissenting.
 
 
 28
 I would affirm the judgment of the Claims Court, but on a different ground than that court gave. In my view, the Secretary of Agriculture's decision of April 12, 1985, was valid, and the Claims Court therefore erred in rejecting that decision in its decision of June 21, 1985.
 
 
 29
 1. On June 14, 1977, the Department of Agriculture published a proposed rule for a price support payment program for sugar cane and sugar beets. Under the rule, entitlement to support payments depended upon when the sugar was "marketed."
 
 
 30
 In commenting on the rule, the appellants, who constitute the Hawaiian sugar industry, pointed out that the Hawaiian segment of the industry differed from the rest of the industry because the Hawaiian industry was vertically integrated. In Hawaii, the sugar cane growers, with minor exceptions, were also sugar processors. The growers had a cooperative arrangement in which they processed their sugar under the name of C & H. C & H, in turn, owned a large refining plant in California that was the sole marketing agent for the Hawaiian industry. C & H either (1) refined raw sugar and sold the refined product, or (2) sold the raw sugar directly to other refiners in the United States.
 
 
 31
 C & H noted that under the Hawaiian sugar industry's marketing arrangements, the final return to the grower was directly tied to the price at which the refined or raw sugar was sold to third parties. In order to guarantee that the return to the grower plus payment under the price support program equalled 13.5 cents per pound, as the regulation required, C & H suggested that the definition of marketing under the program, as applied to the Hawaiian sugar industry, be clarified to provide that a marketing of sugar did not occur until C & H sold either the raw or the refined sugar to third parties. This suggestion was adopted in the final regulations for the payment program, which were promulgated on October 7, 1977. 7 C.F.R. Sec. 1435.3(d) provided:
 
 
 32
 [W]here raw cane sugar processors market their sugar through a cooperatively-owned refinery, marketing shall not be deemed to have occurred until the raw sugar or refined sugar produced therefrom is marketed by the cooperative....
 
 
 33
 2. On September 29, 1977, Congress enacted an amendment to the Food and Agriculture Act of 1977, Pub.L. No. 95-113, Sec. 902, 91 Stat. 949 (1977) (codified at 7 U.S.C. Sec. 1446(f)), which required that the Department of Agriculture implement a loan program to support the price of sugar. The amendment provided that the 1977 and 1978 crops of sugar should "be supported through loans or purchases," rather than payments. Under the loan program, processors were eligible for non-recourse loans at the rate of 13.5 cents per pound of raw sugar placed in storage as security for the loan. If, after eleven months, the market price of sugar did not rise above 13.5 cents per pound, a processor could default on the loan. Thus, the government would in effect have bought the sugar at 13.5 cents per pound. On the other hand, if the market price rose above 13.5 cents per pound, the processor had the opportunity to redeem the sugar and sell it at the higher market price.
 
 
 34
 3. At the time the price support programs were implemented, C & H and the integrated processor refiners in Louisiana (IPRs) could qualify for the loan program because they had sugar physically available to them to place under loan. Both C & H and the IPRs, however, would have had to divert raw sugar from their refineries or import foreign raw sugar in order to utilize the loan program. Thus, the two entities were similarly situated with regard to the "economic availability" of the loan program.
 
 
 35
 C & H and the IPRs were not similarly situated, however, with regard to the knowledge they had regarding their qualification to participate in the loan program. Although the program regulations addressed the marketing situation of C & H, they did not deal with the special situation of the IPRs. The regulations covered marketing by a cooperative or through a formal contract. See 7 C.F.R. Sec. 1435.3(d). Unlike C & H, the IPRs purchased most of their sugar cane from independent growers. They then processed it into raw sugar and refined it for sale.
 
 
 36
 Since the IPRs neither sold any raw sugar nor entered into formal contracts for the sale of the raw sugar they produced to their refineries, the IPRs were unsure when their sugar would be considered marketed and thus qualified for price supports. The IPRs discussed the problem with the Department of Agriculture. Department officials informed them that their sugar should be considered marketed when the raw sugar was transferred to the refinery. Although the Department's advice later turned out to be erroneous, the IPRs relied on this advice in good faith.
 
 
 37
 In contrast, the regulations (as the result of the change made in response to C & H's earlier comments on the payment program) specified the standards for determining when C & H's sugar was marketed, namely, when C & H sold either the raw sugar or the refined sugar it had produced therefrom. C & H made no attempt to obtain any changes in or interpretation of the loan program regulations to deal with any of its particular problems.
 
 
 38
 In reliance on informal advice received from the Department of Agriculture, the IPRs believed that all their 1977 sugar had qualified for the payment program. They therefore did not consider placement of their sugar under loan while they still had physical possession of the sugar. In contrast, C & H had suggested that the regulations applicable to them be adopted. They were therefore well aware throughout the operation of the loan program that certain of their sugar would not qualify for payment, but would have to be placed under loan if it was to receive price support.
 
 
 39
 4. In his April 12, 1985 decision, made in response to the Claims Court's first remand in this case, the Secretary found that the IPRs and C & H were not similarly situated for purposes of the 1977 price support programs:
 
 
 40
 Due to a deficiency in the 1977 payment program regulations and the [IPRs'] reliance on advice given by program officials, the IPRs lacked the knowledge and information to avail themselves of the loan program. In contrast, C & H was fully apprised, by way of the terms of the regulations themselves, of exactly where the Hawaiian industry stood vis-a-vis the two 1977 price support programs.
 
 
 41
 5. In holding in its decision of June 21, 1985, that the Secretary had failed to justify the different treatment of C & H and the IPRs for purposes of the payment program, the Claims Court failed to give adequate recognition to the broad discretion the Secretary had in conducting and implementing the program and to the limited scope of judicial review of his decision made in the performance of that function. An agency determination is arbitrary and capricious only if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfr. Ass'n v. State Farm Mut., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The court is not "empowered to substitute its judgment for that of the expert agency," where the agency has articulated a "rational connection between the facts found and the choice made." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86, 95 S.Ct. 438, 441-42, 42 L.Ed.2d 447 (1974); Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).
 
 
 42
 Although one might disagree with the Secretary's conclusion, his decision was entitled to the deference customarily accorded to an expert agency's decision made in connection with the performance of its function. I think that the Secretary articulated a rational basis for his decision to treat the IPRs and C & H differently.
 
 
 43
 As both parties concede, C & H could have participated in the loan program if it had chosen to do so. C & H had the option of either diverting raw sugar from its refineries or of importing raw sugar. The loan program was thus fully available to C & H in the sense that raw sugar was physically available and C & H possessed the information and knowledge necessary to avail itself of the loan program. The question is whether the Secretary was required retroactively to supply C & H with price supports after C & H chose to use its sugar in its refineries rather than to participate in the loan program.
 
 
 44
 As the Secretary properly recognized, the economic availability of a commodity for placement under a loan program is generally not a relevant consideration in determining whether a price support has been made available to the given producer. See Secretary of Agriculture, Memorandum of Determination (April 11, 1985). While payment programs are frequently designed to ensure that a producer receives a specified price for a commodity when it is sold, the "essence of a loan program ... is that the producer must make an economic choice between serving his customer or placing the commodity under loan." Id. Decisions about whether to participate in a loan program "are business decisions which fluctuate with each potential participant" in the program. Id.
 
 
 45
 As the court explained in Amalgamated Sugar Co. v. Bergland, Civil No. 75-1245 (D.Idaho), a case involving aspects of the price support programs for beet sugar processors not at issue here:
 
 
 46
 [T]he payment program and the loan program are completely different. Whereas a payment program is not intended to interfere with normal marketing activities of the processor, a loan program provides a minimum price for the product.
 
 
 47
 ....
 
 
 48
 Since the payment program permitted processors to participate fully in the program without influencing their decisions in the market place, there were few, if any, impediments to a processor's complete participation in that program. Participation in the loan program, however, was dependent on the willingness of the processor to forego normal marketing opportunities....
 
 
 49
 Id.
 
 
 50
 The court in Amalgamated Sugar recognized that the loan program did not require the Secretary to provide the same amount of price support to all participants, so long as the same level of price supports was "available" to all participants who chose to make the marketing decisions necessary to participate in the program.
 
 
 51
 As C & H admits, its decision not to participate in the loan program was "essentially a marketing decision." Although C & H had the knowledge and the ability to participate fully in the loan program, C & H made an informed business decision to forego the benefits of this program. C & H cannot now complain that it is entitled to the price supports it deliberately rejected.
 
 
 52
 The court assumes that Congress intended to provide "price support for all sugar cane of the 1977 crop," regardless of the marketing decisions of the potential participants in the loan program. The court relies on an item of the legislative history of 7 U.S.C. Sec. 1446(f) stating that "a substantially equal level of price support [should] be provided for all sugar cane and sugar beets of the 1977 crop." See H.R.Conf.Rep. No. 599, 95th Cong., 1st Sess. 174, reprinted in 1977 U.S.Code Cong. & Admin. News 1704, 2474. C & H, however, was "provided" with the opportunity to obtain an equal level of price supports as other producers by participating in the loan program, but chose not to do so. The Claims Court was not justified in rejecting the Secretary's determination, as it did in its decision of June 21, 1985.
 
 
 
 *
 The Honorable Phillip B. Baldwin assumed status as Senior Circuit Judge on November 25, 1986, after having participated as an active judge in the consideration and decision of this appeal
 
 
 [1]
 7 U.S.C. Sec. 1339a, current language of which was enacted in 1965 (Pub.L. No. 89-321, 79 Stat. 1187, 1192), provides as follows:
 Notwithstanding any other provision of law, performance rendered in good faith in reliance upon action or advice of an authorized representative of the Secretary may be accepted as meeting the requirements of any program under which price support is extended or payments are made to farmers and price support may be extended or payment may be made therefor in accordance with such action or advice to the extent the Secretary deems it desirable in order to provide fair and equitable treatment.
 
 
 [2]
 The "hard choice" was between serving the needs of their refineries and placing sugar under loan
 
 
 [3]
 The dissenting opinion says the loan program was "fully available" to C & H "in the sense that raw sugar was physically available." However, this form-over-substance approach overlooks the Secretary's determination regarding the cost of diverting or importing sugar to participate in the loan program. Indeed, as Senator Long pointed out in his letter to the Secretary (App. at 88-90), the loan program as implemented left those who had committed sugar during the course of the payment program without a choice. Payments that had been deferred under the definition of "marketing" were no longer available. As a practical matter, C & H's "business decision" to not participate was forced by circumstances beyond its control. The Secretary's failure to consider them was error in view of the Congressional mandate that all domestic producers of the 1977 crop should receive substantially equal levels of price support. Thus, the Claims Court was fully justified in concluding that the Secretary failed to meaningfully differentiate between the IPRs and C & H for purposes of the payment program
 
 
 [4]
 We agree with the Secretary that section 1339a authorizes him to grant relief where payments have been made and received in good faith reliance on USDA advice. We note that the amount of relief claimed by plaintiffs and calculated by the Secretary is $8,745,910.54. We also note that the Secretary has calculated that $2,152,991.09 would be owed the Government from processors in other producing areas, resulting from the impact on national average market price of recognizing additional sales by C & H